UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | X | |
|---|---|---|
| BLACKSTONE AUDIO, INC. D/B/A BLACKSTONE PUBLISHING, | : | Civil Action No: ___-CV-_____ |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| CATHERINE RYAN HOWARD, | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |
| | X | |

Plaintiff Blackstone Audio, Inc. d/b/a Blackstone Publishing, Inc. ("Plaintiff," "Blackstone" or "Publisher"), by its attorneys, Fox Rothschild LLP, brings this Complaint for damages against Defendant Catherine Ryan Howard ("Defendant," "Howard" or "Author"), and complains and alleges, upon knowledge with respect to its own acts and upon information and belief with respect to the acts of all others as follows:

### INTRODUCTION

1. This case arises from Defendant's knowing and deliberate breach of an agreement entered into by and between Blackstone and Defendant dated April 3, 2019, pursuant to which Blackstone acquired the sole and exclusive right to publish, market and distribute throughout the United States and Canada six (6) original literary works to be written by Defendant (the "Publishing Agreement").

2. The Parties were well acquainted with each other prior to the April 2019 agreement because Blackstone had been the primary champion fighting for Defendant's relevance and the establishment of her brand in the United States. Prior to the 2019 agreement, Blackstone had

published, marketed and promoted the first four of Defendant's mystery thriller novels distributed to an American audience.

3. The six (6) book deal was off to a good start with Defendant submitting three novels that were published and sold by Blackstone, with varying degrees of success.

4. Defendant's recalcitrance, which gave rise to this dispute, began to fester with book four (which is identified herein as "Book 8") of six.[1] As is customary in the book publishing industry, and as specifically allowed under the terms of the Publishing Agreement, Blackstone's editorial team provided Defendant with edits to the Book 8 manuscript. Fully aware of this process, having published seven novels previously, Defendant inexplicably refused to make the edits and decided to leave the novel in an "editorially unacceptable" state. Defendant's refusal to assist the editorial staff in bringing the novel up to a publishable standard is a direct breach of the Publishing Agreement.

5. Defendant further breached the Publishing Agreement by refusing to submit the fifth book to Blackstone for publication, which was due on or before March 1, 2025, and has vowed not to submit the sixth book at all.

6. To make matters worse, notwithstanding the failure to fulfill her obligations to Blackstone and submit six (6) quality novels, Defendant further violated the Publishing Agreement by entering a two-book deal with a rival publishing house and seeking to satisfy her new obligations to this other publishing house **before** satisfying her commitments to Blackstone.

7. As a result of Defendant's unreasonable decision not to bring Book 8 up to standard, her outright refusal to submit the fifth book, threatening further breach of the agreement by

---

[1] For clarification, under the Publishing Agreement the six books required to be delivered by Author to Blackstone were tentatively titled "Book 5," "Book 6," "Book 7," "Book 8," "Book 9", and "Book 10."

reneging on her obligation to submit a sixth novel, and dating a competing publishing company while still married to Blackstone, has made this unfortunate lawsuit necessary.

## THE PARTIES

8. Plaintiff Blackstone Audio, Inc. d/b/a Blackstone Publishing is a Domestic Corporation organized and existing under the laws of the State of Oregon with a principal place of business at 31 Mistletoe Rd, Ashland Oregon 97520.

9. Catherine Ryan Howard is an individual with a primary address located at C/O David Higham Associates Limited with its principal office located at 6th Floor Waverly House, 7-12 Noel Street, London, WIF 8GQ.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

12. Jurisdiction and venue in this District is also proper pursuant to Paragraph 19 of the Publishing Agreement, which provides that "any litigation or dispute relating to or arising out of this Agreement shall be heard, determined and resolved in the state or federal courts located in the State of New York."

## FACTS COMMON TO ALL CAUSES OF ACTION

A. **Entering into the Publishing Agreement**

13. Founded in 1987, Blackstone is one of the nation's leading privately owned independent publishing houses. The Company boasts a catalog of over 21,000 titles in print, e-

book, and audiobook formats, publishing works in diverse subject areas by a vast number of seasoned and accomplished authors, including Neil deGrasse Tyson, Ayn Rand, Ian Fleming, Don Winslow and others.

14. Under its current leadership, Blackstone has grown exponentially, becoming not only one of the largest audiobook publishers in the United States, but also as a publisher of bestselling print and digital books.

15. Amongst numerous others, Blackstone recently achieved another milestone with one of its authors, Janeva Rose, making the Number 1 *New York Times* Bestselling list for hardcover and e-book combined.

16. Howard is an award-winning, bestselling writer from Cork, Ireland. Howard writes mystery crime thrillers and has written books recognized by the Mystery Writers of America and the UK Crime Writer's Association. She has also earned several awards, including Irish Crime Fiction Book of the Year, *New York Times* list of Best Thrillers of the Year, and *Washington Post's* Best Mysteries and Thrillers.

17. The relationship between Howard and Blackstone started sometime before 2016, when they began working to increase Howard's visibility in the American market. To further this agenda, Blackstone edited, published, and promoted four mystery thriller novels written by Howard. As a result of this then-symbiotic writer-publisher relationship, Howard's name and brand recognition began to grow in the United States.

18. This early success led Howard and Blackstone to make a long-term commitment to each other.

19. The arrangement was solidified in April 2019 and memorialized in the Publishing Agreement that is central to this lawsuit.

177255103.1

20. The pillars of the Agreement involve Howard writing six (6) original literary works for Blackstone to publish, market, promote and sell to its American and Canadian readership. The first book was due from Howard in March 2021 and the last of the six books was to be completed by March 2026.

B. **Applicable Terms of the Publishing Agreement**

21. Section 1 of the Publishing Agreement gives Blackstone sole and exclusive right to print, publish, distribute, market, promote, and sell six (6) books written by Howard throughout the United States and Canada.

22. Section 4 of the Publishing Agreement requires Howard to deliver Blackstone one (1) copy of the complete manuscript of "each Individual Title **in content and form satisfactory to [Blackstone]**." (Emphasis added).

23. The Initial Delivery Dates of the six (6) manuscripts referenced in Blackstone's Publishing Agreement with Howard are**:**

> Untitled CRH Book 5: March 1, 2021
> Untitled CRH Book 6: March 1, 2022
> Untitled CRH Book 7: March 1, 2023
> Untitled CRH Book 8: March 1, 2024
> Untitled CRH Book 9: March 1, 2025
> Untitled CRH Book 10: March 1, 2026

Publishing Agreement, at Section 4(A)(i)

24. Howard received (or is scheduled to receive) recoupable advances for each book. *See* Publishing Agreement at § 12(A). She received seventy thousand dollars ($70,000) when the Publishing Agreement was signed as an advancement on CRH Book 5, later titled "56 Days." Howard received another seventy thousand dollars ($70,000) as an Advance for CRH Book 6, later titled "Run Time." For CRH Book 7, titled "The Trap," Howard received a total of one hundred thousand dollars. Howard was also to receive an advance for "Burn After Reading" (Book 8)

5

totaling one hundred thousand dollars ($100,000) had it been submitted in a manner editorially acceptable to Blackstone.

25. If and when Howard submits an editorially acceptable version of CRH Book 9 she will be entitled to sixty thousand dollars ($60,000) upon submission and an additional sixty thousand dollars ($60,000) when the book is published. For the final book in the contract, Blackstone is to pay Howard an advance of one hundred twenty thousand dollars ($120,000). *Id.*

26. With each book, the Publishing Agreement explains that Blackstone is to notify Howard within thirty (30) days of each Initial Delivery Date "whether or not each Individual Title is editorially acceptable" to Blackstone. *Id.* at Section 4(A)(ii).

27. If the manuscript is not "editorially acceptable," Howard would receive detailed comments and recommendations from Blackstone's assigned and experienced editors. Howard is then given sixty (60) days to make the revisions. Within thirty (30) days of the revisions being completed, Howard is told if the novel has been elevated to a publishable quality. *Id.*

28. If Howard's revisions fall short of rendering the manuscript editorially acceptable to Blackstone, the Agreement can be terminated, but only as to that particular novel. The "**Agreement shall be considered in force and in effect for any other Individual Title(s) which remain.**" *Id.* (Emphasis in original).

29. The contract required the parties to work together. As explained above, no book would be published if it failed to meet Blackstone's standards of excellence. Likewise, Howard needed to sign off on any changes made to her manuscript because, under the Publishing Agreement, Blackstone is not allowed to "make any changes or edits to the manuscript of the Work, no matter how minor, including any grammatical changes or punctuation edits, without first

seeking and receiving such approval from [Howard] for any specifically proposed changes." *Id.* at 4(C).

30. In addition to marketing and sales, the Publishing Agreement provided Blackstone with authority to design each book cover (with Howard's approval), set prices, and to make sure readers had the option of hardcover, e-book, paperback and audio. *Id.* at 5(A) – (C). In performing these duties, Blackstone agreed to exercise its best efforts and to take special care to produce a high-quality finished product in a timely manner. *Id.* at 5(A).

31. The money generated from the sale of the books in English in the United States and Canada were shared, with Howard receiving:

- Sixty percent (60%) of net funds generated from reprints of the entire Work or shortened Editions in anthologies;

- Ninety percent (90%) of net funds of first serial rights and reprint of selections and shortened versions in magazines or newspapers;

- Eighty percent (80%) from second serial rights and reprint of selections and shortened Editions in any magazine or newspaper;

- Fifty percent (50%) of the funds generated from the reproduction of the Work for the physically challenged and braille for the visually impaired; and

- Sixty percent (60%) of the net of any funds received from the sale of subsidiary rights for any sublicense to sell English-language Editions of a Work.

Publishing Agreement at § 7(B).

32. The Publishing Agreement also entitled Howard to receive Royalties equal to ten percent (10%) of the net amounts received from hardcover book sales, with that percentage increasing to as much as fifteen percent (15%), depending on the number of copies sold. *Id.* at § 12(B). Royalties for the sale of paperback copies range from seven and one-half percent (7.5%) to ten percent (10%). Howard could receive a whopping twenty-five percent (25%) for internet downloads or other digital sales and rentals. *Id.* at § 12(B).

33. Section 13 of the Publishing Agreement required Blackstone to provide "semi-annual statements of account and to make payments on or before April first and October first of each year covering sales (less returns) to the preceding January first and July first respectively." *Id.* at § 13(A).

34. To further solidify the sanctity of the relationship between Author and Publisher, Howard further agreed that:

> during the existence of the Agreement, [she] will not prepare or cause to be prepared or published [in her] name or otherwise, any work based upon or derived from the Work (submitted to Blackstone under the Agreement) and that would compete directly with [Blackstone's] editions of the Work.

*Id.* at § 10.

C. **Blackstone and Howard's Pre-Breach Relationship**

35. As mentioned above in the "Introduction" section of this Complaint, the relationship between Howard and Blacksone began years before they entered into the Publishing Agreement in April, 2019.

36. The first novel authored by Howard and published by Blackstone was *Distress Signals* in May 2016. That book is considered a "Mystery Thriller." It involves a man on a search for his missing girlfriend. The book received good reviews, with some describing the tale as a realistic psychological thriller with an evolving story line that is twisty and complex, with an unpredictable ending. To date, net sales receipts for *Distress Signals* are $211,494.00.[2]

37. Two years later, Blackstone published Howard's, *The Liar's Girl*. That book involved a woman discovering that the attractive, charming and intelligent love of her life is a violent criminal with secrets even more shocking than his being a prolific serial killer. Like

---

[2] The sales figures for Howard's literary works described herein only represent sales to date. All the novels referenced continue to be sold and distributed by Blackstone.

*Distress Signal,* this novel is also a "Mystery Thriller." It was nominated for an Edgar Award, which is given by the Mystery Writers of America and recognizes distinguished work in mystery fiction. Net sales from *The Liar's Girl* have so far reached nearly $400,000.

38. Blackstone published and sold *Rewind* in 2019. As with the other Howard novels, *Rewind* is a Mystery Thriller that contains a healthy dose of psychological suspense. The book did not do as well as the previous two in sales revenue, netting only $117,797.

39. *The Nothing Man* followed in 2020. Not surprisingly, this book is also a thriller, full of suspense and windy storytelling. *The Nothing Man* is about a "retired" serial killer who inadvertently comes across a memoir written by one of his surviving victims. When the killer realizes that his former victim is getting close to catching him, the games begin. The book received good reviews and netted Howard and Blackstone nearly $300,000.

40. The first book published by Blackstone as part of the six (6) book deal at issue here is *56 Days,* which is – not surprisingly – another mystery crime thriller. In this story, a new couple move in together when the government imposes a strict COVID-19 lockdown. Before the lockdown is over, one of them is dead. *56 Days* enjoyed great critical acclaim being named a *New York Times* Best Thriller, a Washington Post Best Thriller, and Crime Novel of the Year at the Irish Book Awards. It has been adapted into a series that will air on Amazon Prime in the near future. Book sales reflected the solid reviews from readers and accolades from the industry, with both Blackstone and Howard reaping huge rewards for the creation, marketing, and promotion of *56* Days. Net revenue from U.S. sales of this novel reached $825,000.

41. The second book written by Howard as part of her six-book deal with Backstone was *Run Time*. That book is a psychological thriller that takes place on the remote set of a horror film. As with Howard's other books, *Run Time* is very suspenseful and, at times, unpredictable.

Sales of this book earned Blackstone and Howard $147,291, not the level of commercial success as *56 Days* but slightly better than *Rewind.*

42. *The Trap*, published in 2023, is a mystery thriller about three missing women and the concerned citizens determined to find them. As with all of Howard's work, readers describe *The Trap* as suspenseful and unpredictable. Sales for *The Trap* was on par with her first novel, *Distress Signals*, exceeding *Run Time*, but falling far short of the commercial success of *The Nothing Man* and her best novel – *56 Days.*

**D.     Howard Communicates with Rival Publishers and Materially Breaches Agreement**

43. As provided in Section 4(A) of the Publishing Agreement, the first draft of the fourth novel in the six-book deal was due on March 1, 2024. In June 2024, Howard submitted the manuscript titled *Burn After Reading.* As with her other novels, *Burn After Reading* is a Mystery Thriller. This tale involved a man suspected of killing his wife and a ghostwriter hired by the suspected killer to help him convince the world of his innocence (similar to OJ Simpson writing *If I Did It: Confessions of the Killer* in 2007).

44. After reviewing the manuscript, Blackstone's editorial staff determined that the draft was not in a form and content that would have significant appeal with an American audience. For one thing, the sports star/villain- protagonist in *Burn After Reading* is an Olympic Cyclist, rather than a football or basketball player. Chapters highlighting the cyclist's training would be boring to an American audience and, according to the experienced Blackstone editors, the novel contains a fake confession that would be unbelievable to readers. Blackstone editors had issues with some of the character development and other things. Overall, the book had potential, but several edits and rewrites were necessary to make it editorially acceptable.

45. Howard was notified of the editorial unacceptability of *Burn After Reading* within the thirty (30) days allotted by Section 4(A)(ii) of the Publishing Agreement. As required by the contract, she was provided detailed comments, edits and suggested revisions. Howard was, from that point, given sixty (60) days to submit a revised copy of the manuscript. *Id.*

46. Howard refused to make the revisions necessary to make *Burn After Reading* editorially acceptable. Her refusal to make the revisions permits Blackstone to terminate the agreement as to *Burn After Reading* and represents a breach with respect to that Individual Title. However, the contract remains in full force and effect as to the remaining books, making Howard contractually obligated to Blackstone to produce another three (3) original literally works for Blackstone's publication. *See* Publishing Agreement at § 4(A)(ii).

47. Simultaneous with her refusal to bring *Burn After Reading* up to a publishable standard, Howard informed Blackstone that she had been engaged in discussions with Simon & Schuster and had, in fact, agreed to a two-book deal with that rival publishing house, despite being obligated to Blackstone for at least two more books.

48. Thus, although having enjoyed a successful nine (9) year professional relationship with Blackstone and receiving more than one million dollars from book sales in the United States and Canada due to Blackstone's marketing and promotion efforts, Howard took steps openly antagonistic to the Publishing Agreement.

49. Pursuant to Section 1, Blackstone was granted the "**the sole and exclusive right**" to publish, market and promote six (6) of Howard's books in the United States and Canada. (Emphasis added). The contract calls for Howard to write one book each year, beginning in March 2021 and ending March 2026.

11

50. Further, with regards to Howard seeking the services of rival publishing houses before completion of her contract with Blackstone, the Agreement contains a written vow from Howard not to "prepare or cause to prepared or published in [her] name or otherwise, any work based upon or derived from the Work and that would compete directly with the Publisher's editions of the Work." Publishing Agreement at § 10.

51. Howard clearly broke her vows in a number of ways, including, but not limited to, entertaining a deal with a rival publishing house while under commitment to Blackstone and refusing to honor her obligation to submit six (6) original literally works in a form and content satisfactory to Blackstone.

## COUNT I
### (Breach of Contract)

52. Blackstone repeats and realleges the allegations in paragraphs 1 through 51 of the complaint as if fully set froth at length herein.

53. Blackstone has fully performed and completed all obligations required under the Publishing Agreement.

54. Section 4(A)(i) of the Publishing Agreement allows the Publisher to only accept a manuscript that is, in Blackstone's opinion, editorially acceptable.

55. Moreover, Section 4(A)(ii) grants Blackstone the right to request that Howard make the revisions and edits necessary to bring the manuscript up to its publishable standards. This Section further required Howard to deliver a revised manuscript within sixty (60) days of receiving edits and revisions.

56. Despite Blackstone's reasonable demands and the clear language of the Publishing Agreement, Howard knowingly and materially breached Section 4 of the Publishing Agreement,

with respect to *Burn After Reading*, by, among other things, refusing to make the novel editorially acceptable to her long-time publisher.

57. As a direct and proximate result of Howard's breach of the Publishing Agreement, with respect to her refusal to bring *Burn After Reading* to a form and content satisfactory to her publisher, Blackstone has been damaged in the amount of no less than $350,000, plus interest, costs and attorneys' fees.

## COUNT II
### (Breach of Contract)

58. Blackstone repeats and realleges the allegations in paragraphs 1 through 57 of the complaint as if fully set froth at length herein.

59. Section 4 of the Publishing Agreement sets forth the delivery schedule for the submission of original literary works by Howard to Blackstone.

60. In accordance with that schedule, Howard was required to submit six (6) books, one per year beginning in March 2021 and ending March, 2026.

61. Howard failed to submit any work to Blackstone since June 2024 when she delivered a draft of *Burn After Reading* in attempt to satisfy her obligation to deliver Book 8. Howard has materially breached the contract failing to submit UNTITLED BOOK 9, which was due in March 2025.

62. As a direct and proximate result of Howard's breach of contract, Blackstone has been damaged in the amount of no less than $350,000, plus interest, costs and attorney's fees.

## COUNT III
### (Breach of Contract)

63. Blackstone repeats and realleges the allegations contained in Paragraphs 1 through 62 of the complaint as if fully set forth at length herein.

64. Blackstone has fully performed and completed all obligations of it required under the Publishing Agreement.

65. Despite Blackstone's repeated demands to Howard to comply with the terms of the Publishing Agreement, Howard has materially breached Section 1 of the Publishing Agreement by infringing upon Blackstone's sole and exclusive right to publish, market, promote and sell six (6) separate literary works authored by Howard in the United States and Canada.  The first manuscript was due to be submitted to Blackstone for publication in 2021 and the final book in 2026.  Blackstone published three of Howard's books pursuant to the contract, with three more remaining.

66. Howard's decision to enter into a separate publishing agreement with Simon & Schuster before fulfilling her delivery obligations to Blackstone breaches the exclusivity provisions of the Publishing Agreement, particularly if the Simon & Schuster book deal involves Howard writing mystery thriller novels with plot twists and a surprising endings.

67. Howard's breach of the Agreement by commissioning Simon & Schuster to also publish, market and sell her literary works is likely to cause significant economic harm to Blackstone's ability to market and promote literary works Howard has already published and on the market.

68. As a direct and proximate result of Howard's breach of contract, Blackstone has been damaged.

## COUNT IV
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

69. Blackstone repeats and realleges the allegations in paragraphs 1 through 68 of the complaint as if fully set forth at length herein.

14

177255103.1

70. The Publishing Agreement is a binding contract between Blackstone Publishing and Catherine Ryan Howard.

71. The Publishing Agreement contains an implied covenant of good faith and fair dealing.

72. Howard deceived Blackstone by preventing Blackstone from receiving the full benefit of what it bargained for under the Publishing Agreement. Blackstone bargained for the right to be the exclusive publisher for Howard's books in the United States and Canada. Blackstone took the commitment to Howard very seriously and has championed her arrival and visibility in the U.S. market for nearly a decade. Howard's decisions to enter into an agreement with Simon & Schuster which would create competing work and make it impossible for Howard to produce quality novels for Blackstone's publication at or before the agreed-upon due dates are acts of bad faith and overt betrayals of Blackstone's long-term and unwavering commitment to publishing, promoting and selling her books.

73. As a result of Howard's violation of her duty to deal in good faith and deal fairly with Blackstone, has caused Blackstone to be damaged in an amount no less than $350,000.

## COUNT V
### (Declaratory Judgment)

74. Blackstone repeats and realleges the allegations in paragraphs 1 through 73 of the complaint as if fully set forth at length herein.

75. An actual controversy exists between the parties.

76. The dispute and controversy between the parties is of a justiciable nature and is not speculative.

77. The Court is vested with the power to declare and adjudicate the rights and other legal relationships of the parties to this action concerning issues raised by this Complaint.

78. Blackstone seeks a declaratory judgment that the Publishing Agreement is a fully enforceable and valid agreement, that Howard is obligated to produce three (3) additional literary works for Blackstone's publication, and that Howard is not allowed to submit any literary works to Simon & Schuster for publication until she has satisfied her delivery obligations under her Publishing Agreement with Blackstone.

79. A judicial determination is necessary and required at this stage in order to adjudicate the parties' respective rights and obligations.

## COUNT VI
## (Specific Performance)

80. Blackstone repeats and realleges the allegations in paragraphs 1 through 79 of the complaint as if fully set forth at length herein.

81. The Publishing Agreement is a binding contract between Blackstone and Catherine Ryan Howard.

82. Blackstone fully performed its obligations under the Publishing Agreement.

83. Blackstone is entitled to the benefit of its bargain and fair and reasonable expectations under the Publishing Agreement.

84. Howard's skill and reputation as a bestselling mystery author makes her services to Blackstone unique. Howard is able and has the means, authority, and power necessary to perform her contractual obligations. However, despite this fact, Howard has failed to perform (or refused to perform) her duties under the Publishing Agreement.

85. There is nothing preventing Howard from performing her contractual obligations.

86. Howard has voluntarily chosen not to perform her contractual duty.

87. Blackstone is entitled to an order directing Howard to specifically perform her contractual obligations and to award damages resulting from her breach of the Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

(a) in respect of Counts I – IV, an award to Blackstone of monetary damages in an amount to be determined at trial, but not less than $350,000;

(b) in respect of Count V, a declaration that (i) the Publication Agreement is a fully enforceable and valid contract, (ii) Blackstone is entitled to the exclusive right to publish, market, promote and sell Howard's literary works in the United States and Canada until her delivery obligations to Blackstone is satisfied, (iii) Howard is precluded from entering into an agreement with Simon & Schuster until her obligations to Blackstone has been satisfied;

(c) in respect to Count VI an order directing Howard to perform her contractual obligations and duties under the Publishing Agreement;

(d) An award to Blackstone of its interest, costs, and attorneys' fees; and

(e) Such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiff Blackstone Publishing hereby demands a trial by jury on all claims so triable as a matter of right.

Dated: September 22, 2025
New York, NY

FOX ROTHSCHILD LLP
*Attorneys for Plaintiff*
*Blackstone Audio, Inc.*

By: _____
DANIEL B. COHEN, ESQ
101 Park Avenue, 17th Floor
New York, NY 10178
Telephone: (973) 548-3383
Facsimile: (973) 992-9125

Email: dcohen@foxrothschild.com

18

177255103.1